**Tommy Lee BARNHART, Plaintiff in Error,**

v.

**INTERNATIONAL HARVESTER COMPANY, a foreign corporation, Defendant in Error.**

**No. 41631.**

Supreme Court of Oklahoma.

April 16, 1968.

As Corrected June 24, 1968.

Rehearing Denied June 25, 1968.

Sanders, McElroy & Whitten, Floyd L. Walker, Tulsa, for plaintiff in error.

Best, Sharp, Thomas & Glass, Joseph M. Best, Joseph A. Sharp, Tulsa, for defendant in error.

BERRY, Justice.

This is a companion appeal to Barnhart v. Freeman Equipment Company, Inc. and Rockwell-Standard Corporation, Okl., 441 P.2d 993. The issues raised by the pleadings and evidentiary matters developed during course of the trial appear therein.

Parties will be referred to as they appeared in the trial court, plaintiff as plaintiff or Barnhart; defendant Freeman Equipment Company as Freeman; defendant Rockwell-Standard Corporation as Rockwell; defendant International Harvester Company as International; Consumers Cooperative Company as Consumers.

The trial court sustained demurrers to the evidence as interposed by Freeman Equipment Company and Rockwell-Standard Corporation, dismissed the action as to these defendants, and submitted the case to the jury only as to the defendant International. The jury returned a verdict in favor of the defendant. Plaintiff prosecutes this appeal from the order of the court overruling his motion for new trial.

Although plaintiff urges five propositions for reversal of the judgment, we are of the opinion a single issue is determinative of the appeal; proposition two, wherein plaintiff contends the misconduct of one of the jurors vitiates the verdict and requires the granting of a new trial.

In support of the motion for new trial and amendment thereto, plaintiff filed the affidavits of two trial jurors and an in-

surance investigator, relating to misconduct of one juror and the investigator during the trial of the case. The deposition of the juror was also taken and filed.

The trial judge cited the insurance adjuster for contempt of court. At the hearing before the trial judge the insurance adjuster testified and substantially the following facts were developed.

At the time of trial the investigator was employed by the insurance company carrying workmen's compensation on Consumers' employees. This employee made an investigation of plaintiff's claim for workmen's compensation against Consumers. The investigator assisted in preparing the case for trial, made the arrangements with an expert witness to testify for the plaintiff, and attended the Barnhart trial.

On Saturday, February 6, 1965, while the Barnhart case was in progress but not completed, the investigator went to the home of H, one of the jurors trying the case. This visit purportedly was for the purpose of settling a claim by the juror's minor son for personal injuries. Negotiations for settlement of the claim had been carried on for several days in telephone conversations with the boy's mother. The investigator first told the mother some papers would be mailed, and when signed and returned to him she would be mailed a check. While the Barnhart trial was in progress the adjuster again called the mother and advised that he would complete the settlement by a personal visit to the home, and wanted the boy, the mother and the father to be present.

After the settlement had been completed, the father advised the investigator he could have asked for more in settlement of the boy's claim, but he did not do any padding and had presented a fair claim, because he knew an unfair claim would raise the insurance rates and it would come back out of everyone's pockets. Further, that he had been serving on the jury in a million dollar lawsuit involving a truck driver, and the trial had been carried over into the next week. Upon inquiring as to

whether the investigator had heard of the case, the investigator replied, "if you mean the Barnhart case, I am very interested in it", and told the juror he had attended the trial and had heard Barnhart's testimony.

These parties discussed the attorneys appearing in the case. The investigator told the juror that he knew David H. Sanders, one of plaintiff's attorneys, and a partner in the law firm that represented the insurance company by whom the investigator was employed.

The juror and the investigator also discussed the testimony of witnesses who had testified. The juror stated that plaintiff appeared to be honest and sincere and was going to school and getting an education, although confined to a wheel chair. The investigator agreed with the juror and replied "I've worked with people like this and they're—it's just remarkable that a man like him— * * * It's wonderful to see a person like this taking or having such good spirit and trying to go about new training and going to school like he is and training for a new position, or at least trying to learn a new occupation."

The investigator then stated that the jury appeared to be a good jury and "to be rather nice looking and intelligent." The juror replied that he did not know any of the jurors but that an accountant, two mechanics, an airline employee, and two housewives were serving on the jury. The juror further commented that one thing he did not like about the jury was that one of the mechanic jurors sitting next to him would, when the attorney made a good point for the plaintiff, nudge the person sitting next to him and say, "did you hear that"; when the court was in recess and the jurors in the assembly room this same juror would attempt to discuss the case with other jurors and point out the favorable points made by the plaintiff. The juror stated that he felt the mechanic juror had already made up his mind in the case, which the juror apparently resented.

The juror asked whether the investigator had seen an exhibit offered by the plain-

tiff, commented that there had been a variance between the testimony of plaintiff's and defendant's witnesses as to how many degrees it took to turn the truck, and that defendant's witnesses had corrected the testimony of the plaintiff.

While discussing the testimony of an expert witness who had testified for the plaintiff, the juror commented that witness "seemed to do a good job." The investigator replied he was glad to know this, since he had secured the witness for the plaintiff, and intended to use him as a witness in another case.

The investigator testified he did not remember telling the juror his company had paid the plaintiff's medical expenses, and were paying him compensation at the rate of $37.50 per week for a period of 500 weeks. When called as a witness in the contempt proceedings the juror testified that the facts were as related in his deposition. The juror believed the investigator told him his company was going to pay the plaintiff compensation at $37.50 per week for 500 weeks. At the close of the conference between these parties the juror cautioned the investigator not to talk to anybody about their conversation.

The investigator testified his company had an interest in the litigation because of paying workmen's compensation benefits to plaintiff; no one connected with the case requested him to go to the juror's home, or talk to him about the case. Further, he had discussed the matter with the officials of his company, and had been advised to "co-operate" with the attorneys for the plaintiff.

At the contempt hearing both the investigator and the juror admitted to the trial judge they had committed a wrong in discussing the case. The juror acknowledged that during the trial the judge had admonished the jury approximately thirty times not to discuss the case with anyone until the trial was concluded.

At the conclusion of the contempt proceedings the trial court held both the investigator and the juror guilty of miscon-

duct in discussing the case. The court stated he could refer the matter to the county attorney, but lacked authority to punish the investigator for contempt, and dismissed the contempt citation as to him, although recognizing the court had power to punish the juror for indirect contempt. After discussing the matter with both parties, the trial court indicated an intention not to take further action.

Upon presentation plaintiff urged the matters outlined necessitated granting of a new trial. After having read the affidavits and depositions relative to what had occurred the trial court stated that, although this was a regrettable occurrence, he was of the opinion the conversation had no effect upon the juror involved. Stating that the only question involved was whether there was any ground upon which to grant a new trial, the court observed that there had been a complete and fair trial, and that he did not believe any other conclusion could have been reached. The motion for new trial was overruled, the court being of the opinion the matters urged were of no consequence.

Our statute, 12 O.S.1961, § 651, relating to granting new trial for misconduct of a jury, in pertinent part, provides:

"A new trial is a re-examination in the same court, of an issue of fact, after a verdict by a jury, the approval of the report of a referee, or a decision by the court. The former verdict, report or decision shall be vacated, and a new trial granted, on the application of the party aggrieved, for any of the following causes, affecting materially the substantial rights of such party:

"First. Irregularity in the proceedings of the court, jury, referee, or prevailing party, or any order of the court or referee, or abuse of discretion, by which the party was prevented from having a fair trial.

"Second. Misconduct of the jury or prevailing party."

The statute has been applied in a variety of situations where it appeared a litigant

was prevented from having a fair trial. In People's Finance & Thrift Co. v. Ferrier, 191 Okl. 364, 129 P.2d 1015, we held that allowing a memorandum used by one counsel, and not introduced into evidence, to be taken into the jury room was ground for granting a new trial. In Merrell v. City of Stillwater, 207 Okl. 344, 249 P.2d 715, failure of all twelve jurors to view the premises as directed was held to constitute such misconduct as required reversal of the judgment and granting of a new trial, it being unnecessary to show that rights of the litigant were prejudiced. In Negrate v. Gunter, Okl., 285 P.2d 194, we affirmed the granting of a new trial where the jury had been allowed to take into the jury room certain exhibits not introduced into evidence. And, it was pointed out that it is the trial court's duty to safeguard the rights of litigants to a fair trial. Also see Williams v. Pressler, 11 Okl. 122, 65 P. 934.

The decisions cited sufficiently establish the rule that trial courts must scrupulously avoid allowing a jury to have access to matters not proper for consideration, or to perform their functions irregularly, as in Merrell, supra. And, to establish misconduct sufficient to afford grounds for new trial it is unnecessary for the losing litigant to show that his rights were prejudiced.

A further statute relating to trial procedure, 12 O.S.1961, § 581, provides:

"Admonition of jury on Separation.

"If the jury are permitted to separate, either during the trial or after the case is submitted to them, they shall be admonished by the court that it is their duty not to converse with, or suffer themselves to be addressed by, any other person, on any subject of the trial, and that it is their duty not to form or express an opinion thereon, until the case is finally submitted to them."

The errant juror acknowledged the statutory admonition required by the statute was given at least thirty times by the trial court. It is undisputed that the juror

violated the statute despite the trial court's consistent admonition. The matter of positive misconduct of a juror committed with an outsider during trial was considered in Garvin v. Harrell, 27 Okl. 373, 113 P. 186, 35 L.R.A.,N.S., 862, Ann.Cas.1912B, 744. In that case the misconduct asserted as grounds of the motion for new trial resulted from the plaintiff taking three jurors to lunch and paying for their meal. Reversing the order overruling defendant's motion for new trial the court stated that such conduct on the part of the prevailing party uniformly is held sufficient to avoid the trial. Upon authority of numerous cited cases reviewed the court observed:

"A lawsuit is at its best, a misfortune, yet when a citizen feels that his rights have been invaded and other means have failed, it is the only method prescribed by the law of the land for the vindication thereof, and the administration of a remedy. He is denied the privilege of seeking and forcing redress by his own strong arm, and compelled to resort to the established tribunals for remedy. A resort to law is usually at the unsuccessful conclusion of all other efforts for adjustment, and all parties confidently appeal to the courts with the abiding conviction that they are right and that justice will be administered unpolluted and exact. It is essential to the well-being of society that this confidence be encouraged and sustained, and that the faith of the people in the courts be not shattered. In order that this may be so, the jury, the trial, and all the proceedings connected with them should not only be free of wrongdoing, but their administration should be so untainted, free, clear, and above board that there will be no room for suspicion that the conclusion reached was influenced by other matters than an unbiased consideration of the law and the evidence and this considered and applied by an honest, upright judge and jury. The fair and impartial jury, duly impaneled, sworn, and charged to try the cause and true deliverance make, has been the bulwark of the best system yet

devised by man for the determination of controverted questions of fact, and our people are content and feel secure in their persons and property because of their abiding confidence in its integrity. When the unfortunate parties, then, unable to settle their own differences, leave them to the judgment of a court and jury, the result should come to them both untainted by a breath of suspicion that aught else than the law of the land and their evidence was even remotely responsible for the verdict. * * * has a right, of which he cannot lawfully be deprived, to have the facts of his case determined by a jury upon which the possibility of undue influence has not been exerted. * * *"

The same result was reached in Jones v. Frank, 62 Okl. 26, 161 P. 795.

Particular acts of misconduct sufficient to provide a basis for new trial are impossible to enumerate. The subject is reviewed at length in 39 Am.Jur., New Trial § 74, et seq. It may be recognized that not all courts hold every communication between a juror and an outsider to be grounds for new trial. Ibid. § 101. Many courts observe great strictness with the view of preserving integrity of jury trials while others, said to represent the weight of authority, apply the rule that such misconduct is insufficient unless it appears that injustice was done the complaining party, or that he was prejudiced thereby.

In 64 A.L.R.2d 162, appears a lengthy annotation dealing with the myriad facets relating to the effect of misconduct, or affecting the jury by communication with an outsider. The foundation of the matter was expressed in Nesmith v. Clinton Fire Ins. Co., 8 Abb.Pr. (N.Y.) 141, thus:

"Jurors are sworn to try the cause according to the law and the evidence. That is not evidence to which the juror listens out of court, when there is no opportunity to meet it, and no chance for cross-examination; and yet it influences the mind, tends to the grossest wrong and

injustice, and is a violation of the most sacred obligations of a juror."

In Welch v. Taverner, 78 Iowa 207, 42 N.W. 650, it was said:

"Jurors must be kept free from all possible influences. When exposed thereto it will not do to inquire into the probability as to the extent of these influences and their effect upon the verdict. There is no safety except in setting aside the verdict in a case where acts and conversations are shown which could have influenced the jury."

The quoted authorities point to the basis of the requirement that jurors must be shielded from possible influence from the outside, which necessarily must result in obstructing due administration of justice, and which may safely be corrected only by setting aside the verdict rendered under such circumstances. Recognition both of the necessity for disapproving any conduct which imperils confidence in the judicial system, and application of the principle that prejudice will be held to result from such misconduct appears in the decision in Garvin, supra.

■■ It is impossible to probe the minds of jurors to determine the extent of prejudice created by misconduct of one member of the jury. Any misconduct which might influence the jury is sufficient to require setting aside of that verdict as a matter of safety. The fact the trial court found no evidence the parties directed the communication is not a controlling factor. The juror violated both his oath and applicable statutes. Admittedly the insurance investigator had an interest in the case. As in Garvin, supra, plaintiff has the right, of which he cannot lawfully be deprived, to have his case determined by a jury upon which possibility of undue influence has not been exerted.

■ Defendant seeks to support the trial court's action by reliance upon the general rule that neither by affidavit nor testimony will a juror be permitted to impeach a verdict for misconduct occurring either inside or outside the jury room. See Horn v.

Sturm, Okl., 408 P.2d 541, and cases therein cited. Upon this basis defendant asserts that the evidence of misconduct was inadmissible, and is not available to plaintiff in this Court to impeach the verdict of the jury.

█ The authorities cited are inapplicable and do not support the conclusion urged by defendant. It is unnecessary to consider the issue from the standpoint of the possible effect of the juror's affidavit relating to misconduct. Knowledge of the misconduct first was brought to plaintiff's counsel by the insurance investigator. As a result plaintiff filed affidavits concerning the matter and thereafter took the juror's deposition as a means of supporting the motion for new trial. Since knowledge of the misconduct came from a source other than the affidavit of the juror the question of competency of the juror's testimony does not require consideration. Jones v. Frank, supra; Merrell v. City of Stillwater, supra. Defendant cites Gutowsky v. Halliburton Oil Well Cementing Co., Okl., 287 P.2d 204; Beckman, Inc. v. May, Okl., 331 P.2d 923 and Willis v. Davis, Okl., 333 P.2d 311, in support of the argument advanced. These cases are not applicable to the factual situation disclosed in this appeal.

█ A further issue on the motion for new trial concerned the presence of an insurance adjuster, brother of one of defense counsel, in the jury assembly room during the noon hour while some members of the jury panel were present. Because gravity of the misconduct of the juror with the insurance adjuster alone requires reversal of this case, we purposely do not consider the question raised in this respect.

Other substantial contentions are presented as grounds for reversal which involve admission and rejection of evidence during the trial, as well as the submission of certain issues and the failure to present others for the jury's consideration. Because this case must be tried again, we purposely avoid reference to these matters.

The trial court erred in holding no ground existed for granting a new trial.

The judgment is reversed and the case remanded to the trial court with directions to set aside the judgment and grant plaintiff a new trial.

WILLIAMS, BLACKBIRD, and HODGES, JJ., concur.

LAVENDER, J., concurs specially.

JACKSON, C. J., and DAVISON, J., dissent.

LAVENDER, Justice (concurring specially):

The affidavit and testimony of the insurance adjustor revealed 1) that he, or rather the company for which he was employed, had a direct pecuniary interest in the outcome of the litigation; 2) the rather "unusual" circumstances surrounding the meeting of the adjustor with the juror when such meeting, apparently, was not necessary to the completion of the adjustor's business with the juror; and 3) the fact that the adjustor freely discussed with the juror the various witnesses who had testified in the cause and expressed to the juror his (the adjustor's) opinion as to the credibility and expertise of certain of the witnesses. The adjustor also discussed other facets of the case—such as the adjustor's opinion of the plaintiff.

In view of the extent of the contact by the insurance adjustor with the juror in which the issues in the case and witnesses, etc., were openly discussed, it is reasonable to infer that prejudice resulted therefrom which prevented the parties, both the plaintiff and defendant, from receiving a fair trial.

My view is that the testimony of the juror was merely cumulative to the testimony of the adjustor and that a new trial could and should be granted upon the testimony of the latter standing alone.

I am authorized to state that WILLIAMS and HODGES, JJ., concur with the views herein above expressed.

JACKSON, Chief Justice (dissenting).

The first question for decision in this case is whether there is any verdict-impeaching value in the affidavits and testimony of the jurors H and G. In Volume 11, West's Oklahoma Digest, New Trial, ☞143(1), 143(2), 143(3), 143(4), 144, and 145, at least thirty decisions are cited from this court wherein we have held that "affidavits, depositions, or oral testimony of jurors are inadmissible to impeach their verdict."

However, in Carter State Bank v. Ross, 52 Okl. 642, 152 P. 1113, after stating the rule we concluded that the testimony of jurors may be admissible to establish facts connected with the deliberations of the jurors that tend to show improper influence or conduct that may have led to an unjust verdict to prove something that does not inhere in the verdict, such as an overt act, open to the knowledge of all of the jury. The Carter State Bank decision was followed in Missouri, O. & G. Ry. Co. v. Smith, 55 Okl. 12, 155 P. 233.

In Egan v. First Nat'l Bank of Tulsa, 67 Okl. 168, 169 P. 621, L.R.A.1918C, 145, we again held that affidavits or testimony of jurors will not be received for the purpose of impeaching their verdict and specifically overruled Carter State Bank v. Ross, 52 Okl. 642, 152 P. 1113, supra, insofar as the holding in Carter Bank is in conflict with the views expressed in Egan.

In Harrod v. Sanders, 137 Okl. 231, 278 P. 1102, we again followed what we called "the qualification to the general rule", as expressed in Missouri, O. & G. Ry. Co. v. Smith, 55 Okl. 12, 155 P. 233, supra, and concluded as in Carter State Bank v. Ross, 52 Okl. 642, 152 P. 1113, supra, that the testimony of the juror to impeach the verdict was proper.

However, in the second paragraph of the syllabus in Wolff v. Oklahoma Railway Co., 184 Okl. 374, 87 P.2d 671, we held:

"The case of Harrod v. Sanders, 137 Okl. 231, 278 P. 1102, insofar as it holds that the testimony or affidavit of a juror is competent evidence to impeach the verdict of the jury for misconduct outside or inside the jury room is expressly overruled."

Except for the three decisions above mentioned which have been overruled, it now appears that in all former decisions wherein the question was considered, we have held that affidavits, depositions and oral testimony of jurors are not admissible to impeach their verdict.

Our attention has been invited to decisions of this court hereinafter to be discussed.

In Williams v. Pressler, 11 Okl. 122, 65 P. 934, the jury prepared and signed a statement in the jury room concerning the manner in which they reached their verdict. The statement was considered by this court in reversing the judgment. The question of the propriety of a jury impeaching its verdict in this manner was not considered.

In Garvin v. Harrell, 27 Okl. 373, 113 P. 186, 35 L.R.A.,N.S., 862, a litigant entertained four of the jurors by paying for their dinners at a restaurant. This court reversed, but the opinion does not disclose whether the proof was made by the jurors or others.

In Jones v. Frank, 62 Okl. 26, 161 P. 795, one of the litigants treated the jury to dinner during the progress of the trial. The point was raised that the jurors were not competent witnesses to prove these facts. This court found it unnecessary to pass upon the question because the evidence of the restaurant keeper was sufficient to establish the facts. In Merrell v. City of Stillwater, 207 Okl. 344, 249 P.2d 715, we noted that all proof of the conduct of the jury was made by testimony of witnesses other than the jurors.

In Negrate v. Gunter, Okl., 285 P.2d 194, the facts were presented by stipulation and it does not appear from our decision that any of the jurors were called upon to give evidence.

In Horn v. Sturn (1965), Okl., 408 P.2d 541, we concluded that it was error for the trial court to consider affidavits of jurors to impeach their verdict and stated that

the presently controlling (1965) rule is announced in Dillard v. Star Drilling Machine Co., 180 Okl. 14, 66 P.2d 928.

Since the affidavits and testimony of jurors H and G may not be utilized to impeach their verdict, under the decisions of this court, I am unable to conclude that the affidavit and testimony of adjuster S concerning his discussion with juror H about the case, standing alone, is sufficient to justify a reversal of the trial court's decision.

It may be that the rule that "affidavits, depositions, or oral testimony of jurors are inadmissible to impeach their verdict" should be re-examined and exceptions made in proper cases. In 33 Am.Jur., Trial, Sections 1105–1116, the question of permitting jurors to impeach their verdict is discussed at considerable length and it is apparent that there is a great diversity of opinion and practice among the courts. In Section 1113, supra, it is said:

> "Misconduct of Third Persons.—While the decisions are not in accord as to the competency of jurors to testify or to make affidavits as to the improper acts of third persons (outside the jury room and apart from their deliberations), the view that their affidavits, depositions, or testimony may be received in evidence for this purpose is supported by considerable authority."

I am of the view that we should not change the rule in our disposition of this case without first giving careful consideration to the authorities and annotations cited under Sec. 1113, supra.

DAVISON, Justice (dissenting).

I am unable to agree with the majority opinion and therefore in dissenting I feel that the case is of sufficient importance that I should express my independent views in the matter.

In my opinion the result of the case should be based on the involved factual situations and in presenting my views it is necessary that the facts be more fully developed.

The two persons essential to the discussion herein, are the juror, Huffaker, and the claim adjuster, Salzman. Huffaker's employment was that of a fire inspector and Salzman was a claim adjuster for the Employers Casualty Company, which company carried the workman's compensation coverage on plaintiff's employer and was also representing that company, with the company's approval and consent, in his company's subrogation rights; that in the case at bar, Salzman assisted plaintiff's counsel in the preparation of the law suit and obtained an expert witness in metallurgy to testify on behalf of plaintiff. Salzman was a very interested person on behalf of the plaintiff.

The evidence discloses the fact that the young son of Huffaker was slightly injured a few days before the beginning of the present trial and that Salzman's company (Employers) had the liability coverage; the injury was insignificant and Salzman agreed to a settlement of the claim for $40.00; Salzman informed the Huffakers that he would send the settlement papers to the Huffakers for their signatures and that the check for $40.00 would be sent them upon return of the signed papers; at that time Salzman and Huffaker were strangers to each other; the following week the trial involved herein was commenced and Salzman attended parts of the trial and thereupon discovered that Huffaker was one of the jurors; after learning that Huffaker was a juror Salzman called the Huffaker residence and informed the Huffakers that it would be necessary for him to bring the settlement papers to the Huffaker residence *at a time when juror Huffaker was at home;* Salzman went to the Huffaker home on Saturday morning (during the progress of the involved trial) when Huffaker was known by Salzman to be at home and by this method was permitted to enter the Huffaker home; that Salzman led Huffaker into discussing the case; Salzman asked Huffaker what he thought about the testimony of a certain expert witness and was informed by Huffaker that he thought he made a good witness and thereupon Salz-

man advised Huffaker that he was glad to know that because he (Salzman) was the one who had recommended the witness to plaintiff's attorneys.

That during the conversation at the Huffaker home, Salzman informed Huffaker that his company had carried the workman's compensation for the employer of plaintiff and that plaintiff was being paid compensation by Salzman's company.

The case involved a large sum of money and the trial consumed approximately ten days. The next day after the verdict was rendered in favor of the defendant, adjuster Salzman *found it convenient* to advise the attorneys for plaintiff of his conversation with juror Huffaker.

Apparently Huffaker was not influenced by Salzman and his vote was in favor of the defendant.

The trial court heard the testimony of Huffaker and Salzman and made the following statement on denying plaintiff's motion for new trial:

"The Court: All right. Briefly, I want to say that this case has given the Court and, I think, everybody in the case a great deal of concern by reason of something that happened after the verdict. *The adjuster for the compensation insurance company for the plaintiff, that is, for plaintiff's employer, went out to the home of James A. Huffaker, a juror in the case, during the trial and had a conversation with him, which is shown by the affidavit of Stan E. Salzman and the deposition of James A. Huffaker.* I am sure that the testimony taken pursuant to the issuance of a citation for indirect contempt of Stan E. Salzman and James A. Huffaker, was taken by the reporter at the time. *I have read the affidavits and I have read the deposition and listened to the witnesses testify, and it is my opinion that even though this is a regrettable thing which certainly should have been looked into, as the Court did at the time, I do not believe that the conversation had any effect whatever on the juror, the juror having voted for the defendant rather than voting for* *the side that he presumably would have been inclined to be for.* And, furthermore, according to all of the affidavits and the testimony that was taken, apparently there was no discussion as to how the case should be decided. The only discussion was as disclosd by this record. And I feel that then the question is whether or not the Court has any ground to give a new trial on the facts in the case. *I feel that the case was as nearly perfectly tried as you can ordinarily try a case by reason of the efforts of counsel on both sides and also the effort that the Court attempted to put forth in seeing to it that this was a complete and fair trial.* I feel that on account of the record in the case, the evidence in the case, taking all the facts into consideration, that the verdict of the jury was correct. I do not believe that you could reach very well any other conclusion other than that reached by the *jury*. And I have attempted to study this out, and the two points discussed by counsel on the motion for new trial, I do not feel are of any consequence. And for that reason, *I want to let the record show the motion for new trial as far as* the International Harvester Company is concerned is overruled. (Emphasis supplied)

In my opinion when Salzman went to Huffaker's home he used the tactics of a door-to-door brush salesman in getting his toe in the door, and his purpose was to prejudice Huffaker in favor of plaintiff's cause, or in failing in this to lay a predicate for the basis of a new trial. In this connection I feel that I should state that in my opinion the attorneys for plaintiff were completely innocent of the actions of Salzman and they are entirely above suspicion in the matter.

In my opinion the finding of the trial court that Huffaker was not prejudiced by the conversation with Salzman, and that such conversation did not prejudice the rights of the plaintiff in obtaining a fair and impartial trial, and denying plaintiff's motion for a new trial did not amount to an abuse of discretion.

The general rule is to the effect that: The granting of or denial of a new trial because of the alleged misconduct of jurors is in the discretion of the trial court and appellate courts will not interfere unless convinced that the discretion has been abused. Stevens v. Depue, 151 Wash. 641, 276 P. 882; Annotation 64 A.L.R.2d, § 14, page 185.